# Chambersburg Saving Fund Association's Appeal.

1. A trustee will not be surcharged for a loss if he has exercised common skill, prudence and caution.

2. A trustee will be held responsible for a loss from supine negligence or wilful default.

3. In determining a trustee's liability for failure to collect and convert assets, regard is to be had to the character of the trust.

4. The duty of a guardian being to hold and retain, he will not be held to the same prompt action in enforcing collection of securities, as an executor, administrator or assignee, whose duty is to collect and distribute.

5. A saving fund association held the title to lands as collateral for a debt due them by Anspach; they assigned for the benefit of creditors. The assignee being informed that Anspach had no title to the lands, and without making proper investigation of the title, &c., took from Anspach other securities and reconveyed the land to him. Anspach's debt having been lost,

[Chambersburg Saving Fund Association's Appeal.]

*Held*, that the assignee was liable, under the circumstances in this case, for the amount of the debt, on the ground of supine negligence.

May 11th 1874.  Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR and GORDON, JJ.

Appeal from the Court of Common Pleas of *Franklin county:* No. 30, Of May Term 1874.  In the matter of account of William McLellan, assignee of the Chambersburg Saving Fund Association.

The Chambersburg Saving Fund Association was an unincorporated stock company organized and doing business previously to 1858 ; their business was receiving deposits, lending money and discounting.  The par value of the stock was $25 per share.

Holmes Crawford was president of the association and William G. Reed the cashier.  Amongst the stockholders were Upton Washabaugh, John Gilmore, Samuel Gilmore, William G. Reed and J. C. Richards : also John Anspach, Jr., who owned one hundred shares.  The association having become embarrassed the stockholders and officers above named (except Anspach), and A. K. McClure, A. H. Senseny, J. S. Nixon, Samuel Seibert, Daniel Trostle, John Cree, J. S. Grier, Samuel R. Fisher, J. A. Eyster and W. B. Gilmore, also stockholders, on the 5th of February 1862, naming themselves "partners in the Chambersburg Saving Fund Association," acknowledged themselves indebted to William L. McLellan in the sum of $50,000, payable in eighteen months with interest: "In trust however for the sole use and benefit of such creditors of the said Chambersburg Saving Fund Association as shall comply with the conditions hereinafter mentioned in this bond."

The bond recited that the association had by reason of probable losses been compelled to go into liquidation and make an assignment of the assets of the partnership for the benefit of its creditors, and there might be a deficit of assets for which the partners were individually liable:

"Therefore, for the purpose of securing the continued confidence of the creditors and the payment of their just claims to the extent of this bond, and also for the purpose of gaining time for converting the assets of the partnership with as little loss as possible, we have severally and jointly given this bond to be a lien upon our respective estates until such deficit, if any there be, shall be paid to the full extent of this obligation, to be collected as hereinbefore provided.  In giving this obligation, however, it is expressly understood and agreed by and between the parties hereto as follows : That their respective legal liabilities under the articles of copartnership of said association shall not be in anywise increased, diminished or changed by the bond, but each party hereto shall be liable upon the bond for such sum or sums respectively, or *pro rata* contribution, as a legal assessment upon his interest in

[Chambersburg Saving Fund Association's Appeal.]

said copartnership may require to pay to the creditors of said association the just and full sum of fifty thousand dollars. Provided, however, that if the deficit in the assets of the partnership should not reach the sum of fifty thousand dollars, then the amount of the actual deficit and no more, shall be collected upon the bond, as before directed.

" It is further understood and agreed that if it shall become necessary to issue execution against any of the subscribers hereto, the payment of the amount due respectively by any one of the parties, according to the rule hereinbefore stated, shall be a full discharge of the liabilities of such parties on this bond; provided, however, that if any of the parties hereto shall fail to pay their just and legal proportion of this bond as hereinbefore agreed and required, and the same cannot be collected by execution, it is hereby declared to be the true intent and meaning of this obligation, that each party hereto shall be liable for such deficit of his co-subscribers, to the full amount of this bond, to be collected, however, according to the rule and conditions hereinbefore adopted.

" It is further understood and agreed and made a condition of this bond, that it shall not be valid nor of any binding force whatever, unless the holders of at least nine-tenths of the indebtedness of the Chambersburg Saving Fund Association (exclusive of the capital stock invested), shall become parties by an agreement or agreements in writing to be filed with the prothonotary of the county of Franklin, Pennsylvania, within sixty days after this bond shall be entered of record in the Court of Common Pleas of Franklin county, Pennsylvania, accepting this obligation and the assets of the said association in the hands of its assignee, under a deed of voluntary assignment for the benefit of creditors, as a full and final discharge of each and every partner in said Chambersburg Saving Fund Association from all liability for or on account of any claim or demand whatsoever of said accepting creditors against the said Chambersburg Saving Fund Association, or against any of its partners who may be individually liable to the creditors of said association.

" No creditor of said association, who may fail to accept under this bond as before directed within the time specified, shall be permitted thereafter to accept as aforesaid and be benefited thereby unless such creditor has failed to receive notice of this bond thirty days previously to the expiration of said sixty days, in which case any creditor may accept as before directed at any time within thirty days after he, she or they may be notified of the existence of this bond upon record. And no creditor of the said Chambersburg Saving Fund Association who shall bring suit against said association, or any of the partners thereof, for the recovery of any debt due from the partnership, or which was contracted for the use of the partnership, after having been notified personally or by

notice left at his, her or their residence or place of business, of the existence of this bond upon record for the benefit of said creditors, shall in anywise or under any circumstances be benefited by this obligation or receive any portion of the money arising therefrom."

Endorsed on the bond on the day of its date was the following :

" It is understood that I have signed this judgment-note to William McLellan in trust for the creditors of the Chambersburg Saving Fund Association, amounting to fifty thousand dollars, upon the following conditions :—If the proposed arrangement goes into effect, I agree to pay my *pro rata* share, according to the amount of my old stock in said institution, of the said judgment of fifty thousand dollars. But if the arrangement fails I do not mean by signing said judgment-note to admit that I am a partner in said association, and liable to the members thereof for any part of the indebtedness of said institution. I also reserve the right to collect off the members of the association, who have not signed the judgment-note, my share of the money that may be collected off them by way of contribution to the losses of the association by the other partners who have signed the judgment-note.

J. ALLISON EYSTER."

By virtue of a warrant of attorney attached to the bond, judgment was on the same day entered on it in the Court of Common Pleas of Franklin county.

A scire facias to revive this judgment was issued October 6th 1866, and judgment by default for $64,146 taken October 31st 1866 in favor of William McLellan, in trust for the creditors, &c.

On the 24th of March 1862, the association, " for the purpose of making a just distribution of the estate, assets and effects of the said association among its creditors," granted, &c., to Benjamin Chambers and Daniel O. Gehr,

" All and singular the lands, tenements and hereditaments belonging to the said Chambersburg Saving Fund Association, now held by the said Holmes Crawford, as trustee of, and for the use, benefit and behoof of the said Chambersburg Saving Fund Association, or by William G. Reed, as cashier of the said Chambersburg Saving Fund Association, for its use, benefit and behoof, or in whosesoever name the legal title to said land, tenements and hereditaments may now be vested, in trust for the said Chambersburg Saving Fund Association, and wheresoever the said lands, tenements and hereditaments may be situate, as well in the county of Schuylkill and the county of Franklin, as in any other county or counties in the said state of Pennsylvania, meaning hereby to grant, * * * unto the said Benjamin Chambers and Daniel O. Gehr, * * * all right, title, claim, demand and property of the said Chambersburg Saving Fund Association, of, in and to all real estate of every kind and description, and wheresoever the same

[Chambersburg Saving Fund Association's Appeal.]

may be situate, and in whosesoever name the legal title to the same may now be vested, belonging to the said Chambersburg Saving Fund Association, and also all the goods, chattels and effects, assets, mortgages, judgments, bonds, single bills, promissory notes, bills of exchange, book accounts, choses in action, cash, moneys, debts, and property of every kind, real, personal and mixed, coming and belonging to the said Chambersburg Saving Fund Association, and constituting the partnership assets of said association, including also all collaterals of every character and description now held by the said Chambersburg Saving Fund Association, for the security and indemnity of the said association : * * * In trust, however, * * * that they the said Benjamin Chambers and Daniel O. Gehr, shall and do, as soon as convenient, sell and dispose of all the lands, tenements and hereditaments, goods and chattels of the said Chambersburg Saving Fund Association, and collect, receive and convert into money, all the said lands, tenements and hereditaments, goods and chattels, assets and effects, * * including the aforesaid collaterals, and with the moneys arising from said goods and chattels, lands, tenements, hereditaments, assets, effects and collaterals, after deducting the reasonable costs and charges of them, the said Benjamin Chambers and Daniel O. Gehr shall and do pay the creditors of the said Chambersburg Saving Fund Association, their respective just demands, in full, if there shall be sufficient assets to satisfy the whole of said creditors, and if there shall not be sufficient assets to pay and satisfy all the just demands of the creditors in full, then *pro rata,* according to the amount of their respective demands without preference as between individuals." * * *

The assignees Gehr and Chambers recorded the deed of assignment, but did not give bond, and on the 14th of April they declined the trust ; on the same day the court appointed William McLellan in their place and directed them to deliver to him the estate assigned. McLellan gave bond and filed an inventory of the estate amounting to $135,614.21. Amongst the assets mentioned was the indebtedness of John Anspach, Jr., made up of the following items :—

| | | |
|---|---|---|
| Six notes of Anspach, Reed & Co., | . . . | $8,773.73 |
| Four notes Replier & Bro., | . . . | 8,412.80 |
| Three notes McCoy, Linn & Co., | . . . | 6,340.75 |
| Three notes J. M. Bickell, | . . . | 6,350.00 |
| One note W. G. Reed, | . . . . | 282.21 |
| Six notes Jno. Anspach, | . . . $12,755.99 | |
| Balance on account stated of Jno. Anspach, | 38,426.28 | 51,182.27 |

$81,341.76

As collateral to this indebtedness the association held, as reported by the auditors, 3100 shares of Elk and McKean Improve-

ment Company stock, 155 shares in the Locust Coal and Iron Company, two tracts of land in Schuylkill county, 60½ acres of coal land in Schuylkill and Columbia counties.

On the 14th of July 1864, the assignee filed his first account, charging himself with $102,697.40, of which $1893.38 were a balance received from the original assignees and the remainder, assets of the estate assigned, realized by him. The credits were for expenses of the trust; they amounted to $6859.55, of which his own commissions were $5114.87; the balance in his hands was $95,837.85. The account was confirmed August 8th 1864 and J. McD. Sharpe, Esq., appointed auditor to distribute the balance amongst the creditors.

He found the amount of indebtedness to be $148,500.85 and after deducting costs of audit, &c., he distributed the balance amongst the creditors at the rate of 60.865 per cent.

The schedule of the claims and dividends accompanying the report contained a number of claims bought by the assignee for the estate. The auditor concluded his whole report, saying:

" The auditor in estimating the indebtedness of the Chambersburg Saving Fund Association, calculated interest on all the claims up to the 1st day of November, A. D. 1864, and charged interest on all the payments from the dates thereof, up to the 1st day of November, A. D. 1864."

On the 3d of November 1864, the report was presented to the court and ordered to be confirmed absolutely unless exceptions should be filed within ten days. No exceptions having been filed, the report was confirmed.

On the 22d of December 1868, the assignee filed a second account. In this account he charged himself with $74,105.86; amongst the charges were these items:—

Amount received by me on notes of stockholders dis-
counted,                                               $12,263.12
Amount received by me as per report of J. McD.
Sharpe, Esq., auditor, on certificates and other
indebtedness lifted by me after deducting previous
payments,                                              $20,649.39

Besides the expenses of the trust the credits were payments to creditors. One item of the expenses was commissions of the assignee, $2221.17.

Exceptions were filed to this account January 21st 1869, viz. :—

By the Gettysburg National Bank—that the assignee had not collected and charged himself with the amount of the judgment $64,416 in favor of the assignee in trust for the creditors of the association against A. K. McClure and others.

By the administrator, &c., of Upton Washabaugh, deceased:—

1. That the accountant has not charged himself with all the moneys that have, and that should have come into his hands.

2. That the accountant has not charged himself with any interest.

3. That the allowance claimed is too high.

Mr. Sharpe was appointed auditor on these exceptions, "to restate the account, ascertain balances due creditors and report distribution."

At the hearing before him, the exceptors gave in evidence the assignment, the bond of the assignee, &c., the indebtedness of the association to the Gettysburg Bank, &c.

The auditor reported :—

" It was admitted that the requisite number of the creditors of the association accepted the terms and provisions of the judgment-bond, and amongst others the Gettysburg National Bank. No other evidence of any kind was submitted to the auditor." * * *

On the exceptions by the administrator, &c., of Washabaugh, he reported :—

" No evidence of any kind has been produced before the auditor to show, that the accountant has failed to charge himself with any moneys actually received prior to the filing of his account ; or that there were, at that time, any other available assets, with which he ought to have charged himself.

" The accountant admits the existence of a judgment for over twenty thousand dollars in the District Court of Philadelphia in favor of the stockholders of the Chambersburg Saving Fund Association, against John Anspach, Jr. But no money has yet been realized thereon, and whether the whole or any part thereof can ever be collected by legal process, involves an experiment of doubtful issue.

" There may be, and no doubt are some other assets belonging to the association, which are not presently available, and with which it would be unfair to charge the accountant at this time. The account before the auditor is not a final one, and should it hereafter be made to appear, that any moneys have been, or ought to have been realized by the assignee, from the outstanding debts due the association, the exceptants will have their day in court to call the accountant to an account of such moneys.

" For these reasons, the auditor overrules the first of the foregoing exceptions.

" The second is also overruled, because the account does not exhibit any balance in the hands of the assignee, to form the basis of an interest calculation.

" The third exception is also without merit, and therefore overruled." * * *

As to the exception of the Gettysburg Bank, he reported :—

" It cannot be denied, that the defendants in the judgment referred to, in the above exception, have always had, since the

26 P. F. Smith—14

execution of the judgment-bond, ample property out of which it could have been collected by legal process. ˙ Neither can it be denied, that more than enough of time has long since elapsed for the accomplishment of this object. But it is strenuously contended by the accountant, *that as assignee*, he has no control over the collection of this judgment, and no duty to perform, with regard to it. This is the hinge upon which the exception turns. If as assignee, it was his duty to collect that judgment, he was derelict in not doing so long ago, and ought therefore to be charged with so much thereof, as may be necessary to liquidate the claims of the creditors, who consented to the arrangement. But if, *as assignee*, he had no such duty to perform, and incurred no responsibility with regard to the money nominated in the bond, then the exception is baseless, and must fall.

"The auditor is of the opinion, and so decides, that the accountant *as assignee* was not bound to collect the judgment, and was charged with no duty in respect thereto.     *   *   *

"Inasmuch as we discover no error in the account, there is no necessity to restate it, and as there is no fund in the hands of the assignee for distribution, the auditor has therefore nothing to distribute, and cannot see that any good purpose would be answered by ascertaining the balances due the creditors at the present time."

On the 11th of September 1869 the report of the auditor came in, and the court ordered that if exceptions to it were not filed within ten days, it should be confirmed. No exceptions were filed, and it was accordingly confirmed. The balance appearing to be due the assignee on his second account was $799.51.

On the 15th of April 1872, the court made the following order :—

"In pursuance of a petition of the stockholders of the Chambersburg Saving Fund Association, to show cause why the judgment No. 38 of April Term 1862, for the sum of $50,000, in the Court of Common Pleas of Franklin county, and revived by William McLellan to No. * * *, should not be satisfied ; upon report of said proceedings by the auditor, it is now ordered that the assignee, William McLellan, do, within thirty days hereafter, file a third and full account of his trust, up to this date, and that therefore a .rule issue upon all the stockholders of the Chambersburg Saving Fund to come in and show cause why the said account should not be confirmed, or be precluded from further objection."

On the 5th of.June 1872, in pursuance of the foregoing order, the assignee filed .a third account.

He charged himself with moneys received on the 2d of August and 22d and 24th.of December 1869, from William G. Reed, on a

[Chambersburg Saving Fund Association's Appeal.]

judgment to October Term 1869, amounting in the whole
to　　　　　　　　　　　　　　　　　　　　　　　$5749.79
And with moneys received from Reed on the 9th of May
and 24th of December 1869, on a judgment to August
Term 1864, amounting in the whole to　.　.　.　792.27

Making the whole amount of charges　.　.　.　.$6542.06
His credits amounted to　.　.　.　.　.　.$6624.29
These credits embraced the balance due him on his second account,
debts of the fund paid by him, and expenses; included in the expenses were counsel fees, $250, and commissions to himself, $150.

To this account the stockholders filed sixteen exceptions:—

2. That he had not charged himself with any interest.

4. That he had not charged himself with all the money that should have been collected from William G. Reed, J. C. Richards, Upton Washabaugh, Reilly & Sharpe, Samuel Seibert, A. K. McClure, and judgment on P. Hamman's docket.

5. That he had not charged himself with all the money received on the report of J. McD. Sharpe, auditor, that he should be charged with.

6. That he had not charged himself with all the money received from John Anspach.

7. That he was accountable for $4996.29 "interest error" in his first account.

8. That he claimed a credit of $566.67 for certificates of deposit No. 523 and 524, when he had paid only $500 for them.

9, 10. That he should not have credit for commissions or attorney's fees.

12. That he exchanged good collaterals received from John Anspach for those which were worthless, and had not charged himself with the losses from this transaction.

13. That he disposed of other collaterals received from Anspach at a great sacrifice, when large sums of money might have been realized from them.

16. That he had not charged himself with all the goods, money, chattels and property which came into his hands as such assignee, or should have come into his hands, and been collected by him, to wit: The Chambersburg Saving Fund Association, at the time of the assignment, held collaterals, such as lands in Schuylkill county, stocks, &c., to secure all the indebtedness due from John Anspach to said association, which said assignee should have taken and held possession of for the use and benefit of said association, and at the earliest moment converted the same into money, and applied to the payment of the debt of said Anspach, and if he thus failed to do so, and allowed said collaterals to pass out of his possession negligently and carelessly, or at a sacrifice, without the whole of the indebtedness of said Anspach being paid, he should be charged

[Chambersburg Saving Fund Association's Appeal.]

with the whole of the amount of indebtedness due from Anspach to said Saving Fund Association.

E. J. Bonbrake, J. W. Douglass and Theodore McGowan, Esqs., were appointed auditors to take testimony, find facts, return the evidence and state an account.

They took and returned a large amount of evidence, amongst the rest:

Deed dated February 4th 1861, John Anspach, Jr., to William G. Reed, "cashier of the Chambersburg Saving Fund Association," for two tracts of land in Rush township, Schuylkill county, one containing 328 acres and the other containing 232 acres. In trust, &c.; that he the said William G. Reed and his heirs, shall and do hold all and singular, the hereditaments and premises hereby granted in trust, for the use of and as a special security and indemnity only to the said Chambersburg Saving Fund Association, for any loss it might or may sustain for or by reason of any and every discount or discounts of any note or notes of the said John Anspach, Jr., now made or hereafter to be made by the said association, and also for all moneys, checks and notes of said association now on deposit or that may hereafter be deposited with the said John Anspach, Jr., by the said association or its agent or agents to be used by the said John Anspach, Jr., for the benefit and advantage of said association or otherwise, as he may be directed for special or other purposes by said association or its agent; and upon a satisfactory settlement and termination of all transactions and accounts, by reason as aforesaid, between the said John Anspach, Jr., and said association," to reconvey to Anspach, &c.

Also, deed dated 15th of February 1861, from Anspach to Reed, "cashier of the Chambersburg Saving Fund Association," for three undivided fourth parts of three contiguous tracts, situate in Schuylkill county, surveyed on three warrants to William Kichner, one containing 246 acres, one containing 370 acres, one containing 298 acres, "excepting, nevertheless, out of this present grant, so much of either one of the above three tracts as is supposed to interfere with an older survey in the warrantee name of Deborah Grant, in 1793."

"In trust, nevertheless, to protect the said William G. Reed, as cashier of the Chambersburg Saving Fund Association, and also the said William G. Reed in his individual capacity, in all debts due, or responsibilities heretofore assumed or hereafter to be assumed in the dealings of the said John Anspach, Jr., with the said William G. Reed, as cashier of the said saving fund association, or with the said saving fund association in any other way, or with the said William G. Reed in his individual capacity; and in trust further to protect the said William G. Reed, as cashier aforesaid, or in his individual capacity, for all responsibility assumed for the said John Anspach, Jr., or for his benefit, either as drawer,

endorser or acceptor of any notes, drafts or other paper, either of the said John Anspach, Jr., or of any other party or parties, negotiated for the benefit of the said John Anspach, Jr.; and in further trust, that upon a fair and satisfactory settlement of all debts, responsibilities, matters and dealings, as above set forth, by and between the said John Anspach, Jr., and the said William G. Reed, as cashier aforesaid, and in his individual capacity as afore- said, then, at the request of the said John Anspach, Jr., his heirs or executors, to grant and reconvey," &c.

Also, obligation referred to in the auditor's report as "A," to wit:—

"On the 1st day of April, A. D. 1863, I promise to pay William McLellan, or order, $14,466.60 value received, with interest from February 16th, A. D. 1863. As collateral security for the payment of said sum of money as above specified, I have transferred to said McLellan eight coupon bonds of the United States of America, for $1000 each, numbered. * * Also, there has been assigned to said McLellan as collateral, two mortgages for $3000 each given by Daniel Haviland of the city of Philadelphia, to John M. Bickel, and recorded in the recorder's office of said city, &c. Said Mc- Lellan to have the privilege of selling said bonds and mortgages on and after said 1st day of April, for the purpose of paying said sum of 14,466.60 with interest as aforesaid, provided that sum is not then paid or some arrangement in relation to the same made satisfactory to said McLellan, and after deducting the expenses and commission incident to such sale, the said McLellan is to appropriate the residue to the payment of said sum of $14,466.60 as aforesaid; and if there is any deficiency, I am to make up such deficiency; and should there be any surplus, the same is to enure to my benefit.

"Witness my hand and seal, the 17th day of February, A. D. 1863.                             J. ANSPACH, [SEAL.]"

"Received on this obligation, $8135.22, in payment of U. S. bonds.

"April 11th 1863.                             WM. McLELLAN."

"Received in cash, $235.80, and a new obligation given for residue, which cancels this.

"October 3d 1863.                             WM. McLELLAN."

Also, obligation referred to in report as "B."

"On the 10th day of May, A. D. 1863, I promise to pay Wil- liam McLellan, or order, 18,330.54, with interest from April 11th 1863; as collateral security for the payment of said sum of money, I have transferred to said McLellan 205 shares of the Locust Mountain Coal and Iron Company, and three mortgages for $3000 each, given by Daniel Haviland of the city of Philadelphia to Jno. M. Bickel, and recorded, &c., with power to convert in case of failure to pay; and after payment of charges and commission,

should there be any deficiency, I am to make the same up; and in case of there being a surplus over and above paying said debt and interest, the same is to enure to my benefit.

"Witness my hand and seal, this 11th April 1863.

"J. ANSPACH, JR., [SEAL.]"

"Received on this obligation, as of July 1st 1864, $10,250, by said Anspach, lifting the Locust Mountain stock, June 18th 1864.                                                              WM. MCLELLAN."

The facts in the case necessary to the understanding of the questions decided in the Supreme Court, can be most satisfactorily obtained from the report of the auditors. They. say :— * * *

"The assignee, on the 16th of February 1863, brought Ans-·pach to a partial funding of the notes"—(heretofore stated as amounting to $81,341.76.) "On that day he surrendered to Anspach five of his own notes, one of William G. Reed's, one of Bickell's, and an indebtedness of Anspach's own of an unknown shape, which notes, with interest then due, made $14,466.60, and took instead the obligation of John Anspach (obligation "A"), for that sum, secured by $8000 of U. S. bonds and two builder's mortgages of $3000 each, given by Daniel Haviland, of Philadelphia, to John M. Bickell, which, with the interest due on them that day, and the accrued interest on the bonds and $286.44 of cash that day paid by Anspach, were regarded as precisely securing the obligation. On the 11th April 1863, Anspach and McLellan again met for the same purpose, when the assignee surrendered the four notes of Repplier & Bro., and five notes of Anspach, Reed & Co., making, with interest computed, $18,330.54, and received in exchange the obligation of John Anspach (obligation "B"), secured by 205 shares of .Locust Mountain Coal and Iron Company stock at $10,250, and three other similar builder's mortgages, made by same parties, of $3000 each, as collaterals. On that day also the assignee returned to Anspach the $8000 U. S. bonds, held by him since 16th Feb. 1863, as collateral to obligation "A," and received for them $8135.22. A controversy arises touching the date and manner of Anspach's payment for these bonds, which will be hereafter noticed, Davis (the assignee's attorney in Philadelphia) continuing his collections from McCoy, Linn & Co., until by his remittance of $2000, on 20th February 1864, he closed the account of McCoy, Linn & Co., and Anspach having paid the interest on the mortgages and the dividends on 205 shares of Locust Mountain stock for the year 1863, and also having made one payment of $4000, on general account, on 22d February 1864. The assignee obtained as the next payment, on 31st March 1864 three drafts of $5000 each, from Anspach, at thirty, sixty and ninety days, on his general account, which drafts the assignee discounted, and which were met by Anspach. On 18th June 1864,

the assignee and Anspach met for a final settlement. The 'financial account' of Anspach was then, for the first time, taken up by name, and a formal statement of it—the balance of $38,426.28 and interest—made, and such credits as were due Anspach on this account, admitted. The 205 shares of Locust Mountain were then surrendered to Anspach and their value, $10,250, added to the balance due by Anspach on his financial account stated, making the sum of $28,085.69. Paying the $85.69 in cash, Anspach gave the assignee four drafts, payable at three, four and five months, for $7000 each, and thus closed this part of his account. He also paid the assignee in cash $502.19, the estimated discount on the drafts, thus making them of their face value in cash.

"Now, by the payment for the $8000 U. S. bonds, Anspach had reduced obligation "A," so that on 3d October 1863, it amounted to $6235.80. On 3d October he paid in cash the $235.80, and gave a new obligation for $6000—cancelling "A" and lifting it—for which new obligation he permitted the two builder's mortgages to stand as collateral. Upon this new obligation he had paid nothing up to 18th June 1864, when the settlement of 'account stated' was made.

"The payment of the four drafts of $7000 each was so deemed a certainty when they were given, that the assignee credited the value of the 205 shares of Locust Mountain, $10,250 on obligation "B," to which they had been as collaterals, thus leaving a balance of about $8000, with interest from 11th April 1863, also due on that obligation on 18th June 1864. This sum of upwards of $14,000 remained unmet by Anspach, and the four drafts of $7000 each having been taken care of, became the only indebtedness of Anspach to the fund, except a note for $2500, given by Anspach in payment of his stock in the fund, which note was not drawn into any of the settlements, but remains unpaid to this day.

"To September Term, A. D. 1865, the assignee entered suit on these remainders against Anspach in the District Court of Philadelphia, and on 20th of February 1866, obtained a judgment against him on a verdict for $17,131.95, on which a fi. fa. was issued and levy made by the sheriff on property; this property being claimed by a second party, was under a sheriff's interpleader awarded to the claimant. On sci. fa. the judgment was revived 22d April 1871, for want of an affidavit of defence, for $22,418.56. A fi. fa. having been issued to March Term 1871, which was stayed, an alias was issued to December Term 1871, under which, 3d January 1872, the sheriff filed a rule of interpleader, James Anspach being claimant of the property, which rule, 17th January 1872, was discharged.

"The assignee accordingly holds to-day a barren judgment against John Anspach for $22,448.56, with interest from 22d April 1871. Now it is apparent, and the auditors so find, that

this deficiency in the payment of Anspach's debt to the fund is ultimately wholly due to the worthlessness of the five builder's mortgages, which the assignee accepted; two of them as collateral to the obligation "A," and again as collateral to the obligation of 3d of October 1863, and three of them as collateral to obligation "B"; for had they, when resorted to, proved to be good, the whole of the Anspach debt would have been amply secured. But Mr. McLellan then found that they were laid on lots in Philadelphia, on which there were no buildings newly erected, as Anspach had told him there were, and that the lots besides were encumbered by a prior mortgage to their value. Mr. McLellan accepted these mortgages upon the mere assertion of Anspach that they were valuable; the properties about to be improved by the erection of five new tenement-houses. He did not visit the premises before taking the mortgages or inquire into their condition and value, but, sometime after he became the holder of these mortgages, visiting the locality with Mr. J. A. Eyster, and seeing new buildings in progress on that block, he was satisfied that these were the buildings secured by his mortgages. After holding the mortgages over two years, at the suggestion of his attorney, he went on the ground with a plot of the square and discovered the deception, the lots mortgaged to him being adjacent to those built on, but themselves unimproved.

"Recurring now to the general line of the assignee's conduct, we find him during this same period collecting other moneys due the fund from its debtors, and paying by instalments from day to day, the debts due the certificate-holders, the depositors, and the banks. * * * Believing, as was the case, that a large saving to the fund and to the partners, who were liable to pay any deficiency of assets, could be made by purchasing certificates at a discount for ready money, the stockholders gave their promissory notes, beginning in April 1862, for in all $12,500, which notes were discounted and the proceeds used, at first by the assignee and afterwards by Judge Kimmell as the agent of the partners, in the buying up of the certificates and deposits. * * * These certificates and deposits, purchased by the assignee or agent, were in all cases assigned to them by the holders. When the funds arising from these stockholders' notes were expended, the buying up was continued with the proper funds of the association, both by the assignee and Judge Kimmell, until the majority of the certificates and deposits were in the hands of the assignee and agent. * * * The stockholders never lifted any of these notes given by them, but constrained the assignee to redeem five of them, the sixth remaining unpaid this day in the Bank of Chambersburg; three of the five notes were received by the assignee from John Anspach, into whose hands they had fallen as cash upon his indebtedness, and two of them from William G. Reed, also as cash upon his indebtedness to the fund.

[Chambersburg Saving Fund Association's Appeal.]

"It will be remembered also that among the collaterals in hand when the assignee was appointed, were the lands in Schuylkill county; these lands, by operation of law, because of the deeds from Anspach to Reed and the deed of assignment, instantly vested in the assignee upon his acceptance of the trust, and the endorsement by Reed of all of the Anspach notes in the fund. Although the assignee never read the deed of assignment, nor did Reed turn over to him the deeds for the lands, yet both the assignee and the stockholders knew of the lands and that they belonged to the fund as collaterals. Mr. Reed had recorded both deeds 21st February 1861, in Schuylkill county. The assignee, in May 1862, with several of the partners, visited the land at Anspach's invitation, met him there, and were shown the lands by him. A colliery, then in operation on the lands, was seen by them. Although the visit convinced them of the great value of the lands, yet they returned home disheartened because of the discredit thrown by two persons whom they accidentally met while there, upon Anspach's title to the land, and Mr. McLellan's assurance that he had been advised by counsel that the title was not good. The assignee, prior to this visit, consulted F. W. Hughes, Esq., of Pottsville, and had been told by him that Anspach had no title to the lands, and his counsel, Mr. Davis, of Philadelphia, had also so advised him. Upon what information Mr. Davis based his opinion, the auditors have no means of now telling. Mr. Davis was not called as a witness, but the opinion of Mr. Hughes, who was offered by the exceptants, was based on a casual conversation with Mr. McLellan, who exhibited to him no papers, but led him to take up the belief that the lands inquired of were those well known in Schuylkill county as the 'Deborah Grant tract,' to which Anspach in fact had no title, and touching which Mr. Hughes says he must have said he had none. But the auditors find that the deed to Reed expressly designates the land conveyed as the then 'Wm. Kichner' tracts, and whether the deed was given to the assignee or not, by Reed, so that he might learn this fact from it, the deed had been recorded in Schuylkill county, in which the assignee was when he saw the lands, and was readily accessible to him as a lawyer and the assignee. To this land the auditors find as a fact that Anspach had, in the language of Mr. Hughes, an indisputably good legal title. Mr. Hughes further says that, being intimately acquainted with these lands, he having been concerned in the compromise, as attorney for the Foulkes and others, and adversely to Anspach, which quieted Anspach's title to these lands, he would have told Mr. McLellan that Anspach's title was indisputable, had Mr. McLellan correctly informed him what lands had been vested in him under the deed of assignment. After this visit, seemingly with the assent of the stockholders, the assignee took no further steps to follow the lands.

He never recorded his deed of assignment in either Schuylkill or Columbia counties, but after the settlement of 18th June 1864, at the request of Anspach, told and advised Mr. Reed to reconvey both tracts to Anspach, which Reed did by his deed of 21st of July 1864, and the lands passed from the fund." * * *

The auditors then referred to the assignee's first account and the auditor's report on it. They proceeded:—

" The auditor's task was a difficult one. The claims against the fund were of three classes: 1st, certificates; 2d, weekly deposits, 3d, debts due banks. Deducting a preferred debt and the expenses from the balance in assignee's hands, he had upwards of sixty per cent. to distribute to creditors. * * * Upon nearly all partial payments had been made at various times; many of them had subsequently been bought up at a discount, and were held for the fund; many were still in the hands of the owners. The auditor, accordingly, computed interest on the face of all claims to November 1st 1864, and on all partial payments to same date, computed dividends on full claims and reported (1st) the amount of claims to November 1st 1864; (2d) dividends thereon; (3d) the partial payment with interest; (4th) balances of unpaid dividends. Such of the dividends as were due to actual holders, the confirmation of the report made it the duty of the assignee to pay out; the dividends upon such of the certificates and deposits as were in his own hands and Judge Kimmell's constructively remained in his own hands, though in fact paid out before the filing of the report. The sum of these remainders of dividends went over into his second account, there to be claimed credit for in the name of the certificates. In this portion of the business, the auditors think the assignee acted with great improvidence. In his first account he had, after giving dates of receipt to all other moneys received, charged himself with a large sum, $76,345.57, as received from John Anspach without date, yet forgetting that his *cestui que trusts* and creditors who were so largely interested would desire, and were entitled to receive the fullest light, he presented a second account in which he not only charged himself, in gross, without date, with the sum of $20,639.49 as received from Mr. Sharpe's report, but in the long account footing up over $70,000 on each side, and concluding with a balance in his own favor, he does not insert a single date on either side, to the many scores of items. This account was filed 22d December 1868, and shows a balance in his favor of $799.41. Yet further to complicate the matter, during the period between 1864 and 1868, namely in 1867, the assignee had suggested to the stockholders, in response to their inquiries, when and how the trust would be ended, the propriety of their assessing themselves in sufficient sums to meet the deficiency as it then appeared. Having, with his counsel, made a calculation of the amount required, he reported to them that five

times the amount of their stock would be required of each for that purpose, with the assurance that an ample margin had been allowed by him, that a surplus would finally result and be returned proportionately to them.   Many assented, and in the fall of 1867, gave to the assignee cash, or promissory notes or judgments, to the amounts of their assessments.   Upon these notes and judgments various sums were subsequently paid by the givers to the assignee portions of them yet remain uncollected, but standing in th assignee's name as collectable assets of the fund.   Now, when the account of 1868 was filed and a balance shown in the assignee's favor, many debts of the fund being yet unpaid, the assurances of 1867 were recalled; the assignee then said that he had been mistaken in his calculation in 1867, and that the assessments as collected, were insufficient to pay the indebtedness." * * *

The auditors then refer to Mr. Sharpe's second report, made September 11th 1869, and proceed :—

" The inventory, a year ago, forthcoming in another investigation, is now said to be lost; the dates of the second account they have been compelled to search for in the records of the courts, and throughout the voluminous testimony, or to reconstruct from the meagre data given them.   The vouchers for payments of the assignee were confined at first to the certificates themselves alone, while the contradictory and varying statements of the leading witnesses, Anspach and McLellan, were often not in accordance with the testimony otherwise derived. * * *

" The exceptions filed reduce substantially to one of the following heads : 1st, failure to account for moneys received; 2d, interest on unemployed balances in his hands; 3d, undue credits taken; 4th, negligence; and 5th, costs. * * *   While the auditors were aware that because of the lapse of time since the confirmation by the court, there may be doubts of the right of a reviewing authority again to pass upon the first account of the assignee, as to what it contains, yet for the purpose of determining what it does not contain, &c., * * * the auditors have stated a single account embracing the whole life of the trust."

The auditors reported on the exceptions *seriatim* and much in detail.   The results being contained in a " summary of facts" which they made and which is hereafter given, it is not necessary to give any part of their report in thus examining them, except a portion of that part of it which relates to the 16th exception.   With regard to this exception, after referring to the assignment and its effect in passing to the assignee the lands conveyed by Anspach to Reed, the cashier, treating the lands conveyed in each deed as one tract, they say :—

" These two tracts of land lay, the one wholly in Schuylkill county, the other partly in Schuylkill and partly in the adjoining county of Columbia.   The former contained about 560 acres and

was regarded as woodland with a possibility of coal. Its value was not great. The other tract was of smaller size, but being undoubted coal-land, developed in working order, was deemed of great value. This tract was held by the cashier in trust for the fund as well as himself. William G. Reed, the cashier, however, when on the witness-stand, said that presently after his discovery of the embarrassed condition of the fund, that John Anspach was its chief debtor; that in Anspach's hands were most of the moneys of the fund, and that because of Anspach's insolvency, they could not be recalled for the purpose of adding to the strength of the securities held by the fund. He (Reed) individually endorsed each and every obligation given to the fund by Anspach, thus pledging his own private estate to meet the assumed deficiency, and passing to the fund whatever interest he had in the title to the other tract of Anspach land which he had been holding for his own security. This being done, the assignee was entitled to demand and receive both tracts in their entirety. The testimony fails to show clearly when the assignee first began to move in the securing of these benefits or lands. He swears that he never received from Reed, cashier, either of the deeds for these lands. Reed, however, while admitting that for a time he did retain the custody of the deed which was meant to protect himself also, says that he gave the key of the safe, which contained all the papers of the fund, to the assignee, and thus, he thinks, turned over the deeds to him. Whether the assignee received the deeds or not, the ·fact that lands—woodland and coal-land—in Schuylkill county were held by the fund as collaterals, was then and before then well known to the directors and assignee. The assignee acted upon this knowledge, and, upon the invitation of Anspach, went to Schuylkill county, accompanied by several stockholders of the fund, to inspect the lands. The company was met by Anspach, who took them on the tract of coal-land, and from the elevation of the coal-breaker thereon erected, pointed out to them the tract encircling them as the one he had conveyed in trust to the fund.

" While on the ground, one or two of the visitors met a stranger named Brock, by whom discredit was cast upon the title of Anspach. A man named Wood, known in former years to the visitors as a resident of Franklin county, was also met by the visitors, and he also cast doubts upon Anspach's title. These declarations of Brock and Wood disheartened the companions of the assignee, and brought them to the conclusion that the tract, though plainly valuable, was yet to be of no benefit to the fund because of the insufficiency of Anspach's title to it. They reported to Anspach the speeches of Brock and Wood, and were answered that, although there was some dispute, he thought his title good. Anspach had previously, by letter to the assignee, of 28th April 1862, represented the tract as a very valuable one in itself and to .

the fund, saying that about 20,000 tons of coal had already been shipped. The assignee also swears.that prior to this visit he had consulted F. W. Hughes, a lawyer, long resident in Pottsville, in extensive practice, and familiar with the titles to coal-lands in Schuylkill county, about Anspach's title, and had been advised by Hughes that Anspach's title was worthless; that O. W. Davis, his counsel in Philadelphia, had also advised him to the same effect. With this advice, touching the validity of the title to these lands, and the information upon the value of the lands themselves, the party returned to Chambersburg and told the result of their inquiries to such of the stockholders as met them. Those at home seemed to fall in with the opinion of the visitors that nothing was to be expected from Schuylkill lands. No further steps were taken by the assignee in the matter. The lands were left to remain from that time (May 1862) as before, in the hands and management of John Anspach, until after the settlement and adjustment between Anspach and the assignee on 18th June 1864, when Anspach gave the drafts for $28,000 to the assignee, and apparently wound up or arranged the last of his indebtedness. Then the assignee informed Reed he had settled finally with Anspach; that his (Anspach's) indebtedness was secured, and that he (Reed) should reconvey the Schuylkill lands to Anspach. Reed did this by deed of 21st July 1864.

"Now it happened that afterwards, when the assignee, who was still the holder of Anspach's obligation for $6000, and of obligation " B," upon which had been realized only the $8135.22 from the U. S. bonds given as collateral to it, in all about $17,000 of obligations, desired to collect them from Anspach, who delayed payment, it proved that the five builder's mortgages, the only collaterals yet remaining, were valueless, being laid on lots in Philadelphia upon which no buildings had been erected, and upon which were prior mortgages. Suit upon the obligations, after some delay, resulted in a judgment for the assignee against Anspach for upwards of $17,000; but an execution issued returned empty to the assignee's hand, Anspach proving insolvent.

"Touching the propriety of the assignee's action in thus suffering Anspach to retain and manage for his own benefit the lands conveyed to Reed, from 1862 to 1864, and in finally advising the reconveyance to Anspach, the exceptants offered at Pottsville testimony, oral and documentary. From this testimony it appears, first, that the assignee, when consulting F. W. Hughes, Esq., did so casually, exhibited to Hughes no papers or deeds, and in their brief interview so described the lands as to give Hughes the impression that the lands in question were those familiar to Schuylkill county men as the 'Deborah Grant' tract, to which in fact Anspach had no title.

" 2. That the tract upon which Anspach took the assignee and company was that upon which, being owned jointly by John Anspach and the wife of Gideon Bast, John Anspach had erected improvements, and which, being worked by Bast for his wife under a lease from Anspach, was and is known as the Bast mine or colliery ; that this tract, which lies in the vicinity of the Deborah Grant tract, contained 60 47-100th acres, and was indisputably vested in John Anspach and Mrs. Bast, Anspach owning 7-16th of it when he conveyed to Reed, and drawing a royalty from the Basts for that proportion ; that this land was and is of the most valuable coallands in the Mahanoy coal region, containing the Mammoth coal vein, and worth at that time over $400 per acre. Upon it also was a breaker, built by Anspach at a cost of $60,000, and belonging to him, thus making Anspach's interest in the tract worth in 1862 over $70,000 ; that all of these facts were well known to Mr. Hughes, who, as counsel for the Foulkes and others, in opposition to Anspach, had arranged the compromise by which Anspach quieted his title to the tract. Says Mr. Hughes, 'had the consultation been a full and explicit one, these facts would have been communicated to the assignee, and he been informed that to this tract Anspach had an indisputably good title;' the title of Anspach moreover was recognised by the Basts, who leased from him and paid him royalty during the years 1862, 1863, 1864. The assignee also testifies that he did not at any time record his deed of assignment in Schuylkill or Columbia counties, and therefore never officially entered those counties in quest of these lands. The deeds from Anspach to Reed had been recorded in Schuylkill county on 21st February 1861, only six days after date of the second deed.

" The assignee, in fine, seems to have suffered himself to be dissuaded from following up the lands by the loose declarations of irresponsible parties accidentally met, the hasty assertions of a lawyer, given upon incorrect data furnished by the assignee himself, and the crude, ill-considered opinions of unqualified laymen. This laxity the auditors deem a weighty element in the scales when determining, after a review of the other facts in the case, the question of the liability for costs in the proceedings of this audit, which is the last question raised by the exceptions. The auditors are of opinion that the accountant ought in fairness to be decreed to pay these costs." * * *

The auditors made the following " summary of facts :"—

" 1. They find that the assignee, in his third account, has, in form, complied with the order of the court to file a *full* account of his trust up to its date ; but that, in substance, it contains errors and omissions which have been corrected by the auditors in their account.

" 2. That the assignee did not charge himself with all of the interest with which he was properly chargeable.

" 3. That he did not charge himself with all of the moneys which he had received on account of his trust.

" 4. That he did not charge himself with the judgments standing in his name against Reed, Richards, Washabaugh, Reilly & Sharpe, on Hammon's docket, Seibert and McClure, but the auditors also find that he is not properly chargeable with them until collected.

" 5. That he has not charged himself with all the moneys received through John Anspach, Jr., to wit: $61 received October 13th 1863, on notes of McCoy, Linn & Co., and also $111.69, difference in discount on drafts of 18th June 1864.

" 6. That he has not charged himself with all the moneys received on the report of J. McD. Sharpe, Esq., to wit: the sum of $370.01, but this error is rectified in the final account stated by the auditors.

" 7. That he is not chargeable with the sum of $4996.29, as error in his first account.

" 8. That he took an undue credit in the items of certificates 523 and 524 in his third account.

" 9. That the assignee is not entitled to an allowance on his third account, because of his agreement not to charge one.

"10. That his employment of counsel was eminently right and their fees properly paid.

"11. That the assessments made in 1867, and paid, were insufficient to pay the actual indebtedness of the fund at that date.

"12. That he did exchange notes held by the fund for other obligations, in part secured by collaterals which proved to be worthless, but whether he exceeded the bounds of that reasonable discretion which a trustee must be permitted to exercise, the auditors cannot say, inasmuch as the comparative value of the paper surrendered was not affirmatively shown.

"13. That he did not, so far as the auditors can discover, sacrifice any of the collaterals in his hands by a sale for less than their value.

"14. That he did not file any vouchers for the payments made by him and entered in his three accounts, but that he exhibited many to the auditors in his first account, and many payments are matters of record; for others he exhibits no vouchers.

"15. A majority of the auditors find that he made a feeble, insufficient attempt to reduce into possession the lands in Schuylkill county, which had, under his deed of assignment, been vested in him; that these lands were of the value of $70,000 and upwards, and were sufficiently valuable to have paid, if sold, the whole indebtedness of Anspach then due the fund.

\* \* \* \* \* \* \*

" We report two tabular statements—the one being an account

proper between the assignee and the other parties, and showing as closely as possible every item of receipt by the assignee on account of the fund and every item of disbursement on same account, each with its proper date.    The second is a summary or statement of results drawn from the first, and .showing the. amounts to be credited to the assignee and the amounts to be charged against him at the close of the various months and years of the trust, and also the balance for or against the accountant at each of said periods.    This statement shows precisely the state of accounts at every one of the periods mentioned, and enabling any one to take a reasonably accurate view of the matter of interest, whether to be charged or not, and if charged, the amount thereof.    *    *    * We refer to these statements as part of our report, and having stated the account thus fully, we simply restate the assignee's third account, commencing with the balance on our full statement immediately after the filing of the assignee's second account.    At that time they find the balance against the accountant to be $3729.70, we having embraced in same all the surcharges made by us that were earlier in date than the filing of second account.

"The tabular statement of balances shows a considerable balance in assignee's hands for some years; and, although they are of opinion that a trustee need not pay out all the moneys on hand, but may, especially in a trust of such magnitude, and insolvent, as that now under consideration, prudently and justifiably keep some funds on hand to meet exigencies that may arise, yet they think the amount held by the assignee was too large, and was held too long continuously, to escape a charge of interest on same.    They therefore charge him with interest on the sum of $3000 for six and a half years."

The auditors then stated an account, charging the assignee with $10,341.76, and after allowing him credits for payments of debts due by the company and certain expenses, found against him a balance of $4800.05.

They also stated an account of the whole management of the assigned estate from the beginning, arranging the items of both debit and credit under specific dates.

Both the stockholders and the assignee filed with the auditors exceptions to their report.

The exceptions of the stockholders were thirty-four, covering almost every particular found by the auditors.

Their principal and most important exceptions related to the alleged negligence of the assignee in permitting the Schuylkill county lands to be reconveyed to Anspach whilst he owed and continues to owe to the estate the sum of $22,418.22.    The 17th exception was :—

"In the matter of the 16th exception.    The auditors having

found that the title to the Schuylkill county lands was vested in the assignee, and having found that Anspach's interest in those lands was worth $70,000, and having authorized W. G. Reed to reconvey these lands to John Anspach, and never having read the deed of assignment or recorded it in Schuylkill county, erred in not having further found that the assignee was guilty of gross negligence in his management of this part of the trust fund, and in not having charged the assignee with the sum of $22,418.22, with interest from the 22d April 1871, which he now alleges is still due by John Anspach to the Saving Fund."

The assignee's exceptions related to the auditors going behind his first and second accounts and the reports of the auditor on them; and changing the accounts and the results; he averring that the former proceedings on them were conclusive; in charging him with interest, and generally to the findings of the auditors against him.

In their report on the exceptions the auditors say :—

" It is the case of a trustee who was not content or permitted first to exhaust the assets and then assess the partners, keeping the two works distinct, but who simultaneously attempted both, who cast the moneys derived from each source into a common fund, and paid them out thus confused and intermingled. By this attempt the assignee has so involved himself and his relations to creditors and to his partner principals, that one statement now must suffice for both, and his present position as to the latter be learned only through his dealings with the former."

As to the 17th exception they say :—

" In the report a majority of the auditors did find that the Schuylkill lands passed to the assignee, and that he authorized their reconveyance. But since the re-argument and re-examination of the evidence, the auditors have now somewhat modified their former finding, so far as relates to the assignee's authorizing or directing W. G. Reed to reconvey these lands to Anspach. We are all still of opinion that the management of these lands was unfortunate and damaging to the Saving Fund. Undoubtedly there was a lack of such care, caution, discernment and thoroughness as the case demanded. But a majority of us further hold that the exceptants shared in this as well as the assignee. Both he and they were undoubtedly anxious to save as much as they could for the Saving Fund, and in concurrence suggested and tried several ways to advance their interests, or rather to break the weight of their common loss. And inasmuch as the present parties were at that time in accord (the exceptants being stockholders and not creditors), and working for their common weal, no doubt mutually influencing each other, a majority of us think it inequitable, now that the vision is clear and the error apparent through later light, that the responsibility shall be cast upon the assignee alone, be-

26 P. F. SMITH—15

[Chambersburg Saving Fund Association's Appeal.]

cause of a line of action, unfortunate in its issue, but shared in at the time by the live or active men of the stockholders."

Mr. McGowan dissented from this finding, saying :—

" I have tried to, but cannot, concur in so much of this finding as imputes contributory negligence to the stockholders—holding that the final accord to which they came with the assignee as to the Schuylkill lands was produced or occasioned by the representations mainly of the assignee himself."

The court (Rowe, J.) confirmed the report of the auditors without delivering an opinion.

The association appealed from the decree of confirmation.

They assigned thirty-one errors—being that the court did not sustain the exceptions to the report of the auditors, and confirmed the report. The 15th assignment was that the court overruled their 17th exception, asking that by reason of his negligence as to the Schuylkill county lands, the assignee should be charged with $22,418.22, the amount of Anspach's debt to the association with interest, on the ground that the debt had been lost by that negligence.

This exception raised the question mainly discussed in the opinion of the Supreme Court.

*H. Gehr* and *W. MacVeagh* (with whom were *G. W. Brewer* and *Kennedy & Stewart*), for appellant.—The loss was occasioned entirely by the negligence of the assignee ; the stockholders had no part in producing it. He should bear the loss : Larkin's Appeal, 2 Wright 457 ; Blackburne's Appeal, 3 Id. 160 ; Stehman's Appeal, 5 Barr 413 ; Neff's Appeal, 7 P. F. Smith 91 ; Long's Estate, 6 Watts 46.

*J. McD. Sharpe* and *A. K. McClure* (with whom was *F. M. Kimmell*), for appellee.—A trustee will not be charged with money which has not come into his hands, unless he has been guilty of negligence so gross as almost to amount to fraud : Nyce's Estate, 5 W. & S. 254 ; Swoyer's Appeal, 5 Barr 383 ; Moore's Appeal, 10 Id. 435 ; During's Appeal, 1 Harris 234 ; Neff's Appeal, 7 P. F. Smith 91.

Mr. Justice MERCUR delivered the opinion of the court, July 2d 1874.

In April 1862, when the appellee accepted the trust, there was due to the appellant, from Anspach, on various obligations, as drawer and endorser, the sum of $81,341.76. In addition to some other personal securities, the appellants then held, as collateral security for this indebtedness, an assignment of certain stocks, and a conveyance of some lands : one piece situated wholly in Schuylkill county. The other partially in each, Schuylkill and Columbia

counties. The latter piece was valuable coal-land, with a mine in working order, and costly improvements thereon in Schuylkill county. These lands had previously been conveyed by Anspach to William G. Reed, the cashier of appellant, the one to secure the appellant for advances made by it at various times to Anspach; the other, to protect Reed, both as cashier, and for liabilities which he had individually incurred to the appellant, by endorsement and otherwise, for Anspach. Having discovered the embarrassed condition of the appellant and of Anspach, Reed had, previous to April 1862, endorsed every obligation held by the appellant against Anspach, and also transferred to the appellant all the interest he had in the tract of land which he had been holding for his own security.

In settlement and adjustment of some of Anspach's liabilities in 1863, the appellee took from him his new obligations, and as collateral thereto, five builder's mortgages of $3000 each, on certain lots in Philadelphia. Anspach failed to pay the whole of these new obligations. Suit was brought on them in 1865, and judgment recovered. On the 22d of April 1871, this judgment was revived for $22,448.56. It remains wholly unpaid, and Anspach has no estate out of which it can be collected. The builder's mortgages proved worthless.

The auditors found that the inability of the appellee to collect the whole indebtedness of Anspach was "wholly due to the worthlessness of the five builder's mortgages which the assignee accepted."

In answer to the claim that the appellee should be charged with a sum equal to the amount of these collaterals, the auditors found "that he did exchange notes held by the plaintiff for other obligations in part secured by collaterals which proved to be worthless; but whether he exceeded the bounds of that reasonable discretion which a trustee must be permitted to exercise, we cannot say, inasmuch as the comparative value of the paper surrendered was not affirmatively shown." In thus speaking of the "value of the paper surrendered," they manifestly did not consider the additional value given thereto by the lands held as collateral security.

Considering the varied and complicated character of the transactions, as well as the conflicting evidence, we are not prepared to say there was positive error in the conclusion of the auditors not to charge the appellee with the amount of these builder's mortgages. We think, however, that the auditors went to the extreme limit of the protection which the law gives to a trustee.

The appellee failed to realize anything out of the coal-lands, but suffered them to be wholly lost to the appellants. Whether he should be surcharged therefor, presents the most important question in the case.

It is well settled that a trustee shall not be surcharged by a court of equity for a loss which has occurred, in case he has exer-

[Chambersburg Saving Fund Association's Appeal.]

cised common skill, common prudence and common caution ; but for supine negligence, or for wilful default, he shall be held responsible : Twaddle's Appeal, 5 Barr 15 ; Moore's Appeal, 10 Id. 435 ; Springer's Estate, 1 P. F. Smith 342.

Then the liability of the appellee must be determined by an examination of the testimony and the ascertainment on which side of the line of separation his conduct has placed him.

In considering whether a trustee has made himself liable for a failure to collect and convert the assets in his hands, regard must be had to the character of the trust. Thus, a guardian would not be held to such prompt action in enforcing the collection of securities, as an executor, administrator or assignee for the benefit of creditors, would be. The duty of the former is to hold and retain ; that of the latter to collect and prepare for distribution : Charlton's Appeal, 10 Casey 473 ; Neff's Appeal, 7 P. F. Smith 91.

It was then the duty of the appellee, within a reasonable time, to make proper efforts to convert all the assets and securities into money for distribution. If he failed to make such efforts, he was guilty of gross negligence and became liable for any loss thereby sustained : Johnston's Estate, 9 W. & S. 107. There an administrator, upon a sale of assets at vendue, took a note with security, payable in six months, and when it fell due, the payors were able to pay it, but the administrator made no effort to collect it within six months after maturity, and by the subsequent insolvency of the makers it was lost. The administrator was held to be chargeable with the loss. That was a case of omission only.

After the appellee obtained the builder's mortgages, he told Reed, who held the legal title to the coal-lands in trust for the appellants, that Anspach had paid the debt which he had owed them. In consequence of this information, Reed reconveyed the lands to Anspach in July 1864. They were thereby wholly lost to the appellants.

The appellee seeks to justify his delay of more than two years in making any attempt to dispose of the coal-lands, as well as his suffering Reed to reconvey them, on the alleged ground that he was informed Anspach had no title to them, and therefore they were of no value to the appellants.

If the appellee had obtained this information in an investigation conducted with reasonable prudence and caution, although untrue in fact, it would have protected him from liability.

What are the facts ? The deeds from Anspach to Reed expressly designate these coal-lands as " surveyed on three several warrants granted to William Kichner," excepting therefrom " so much of either one of the above three tracts as is supposed to interfere with an older survey in the warrantee name of Deborah Grant in 1793."

The mines being worked were not on those portions covered by

the Deborah Grant survey. Within two weeks after the appellee's appointment, his attention was called, by letter from Anspach, to the value of these coal-lands. He was then informed that 20,000 tons of coal had been shipped from one of the properties. He was invited to go upon the ground, and personally to examine the property. About two weeks thereafter he went to the mines in company with Anspach and some of the stockholders of the plaintiff. He went on the coal-breaker. Standing upon it, the surrounding lands were pointed out to him as those which Anspach had conveyed. He was satisfied of their value. But while on the ground they casually met two persons, one of them a stranger, the other previously known to them. Both of these persons cast discredit on Anspach's title. The appellee afterwards consulted F. W. Hughes, a well-known lawyer of Pottsville, and at some time with O. W. Davis, his counsel in Philadelphia, in regard to the title. Each of them advised him that Anspach's title was worthless.

The deeds from Anspach to Reed were recorded in Schuylkill county in 1861. A deed in partition conveying the lands to Anspach had been recorded there in 1858. The appellee made no examination of the records. He had never examined the deed of assignment. He remained in ignorance of the name of the tract on which the mines were located. He neither read any of the title-papers, nor, so far as it appears, did he inquire of any person the names of the tracts conveyed. He appears to have assumed, what the deed expressly denied, that the land conveyed was covered by the Deborah Grant survey. He submitted no title-papers to either Mr. Hughes or Mr. Davis. The testimony fails to show that he gave to Mr. Davis any information calculated to guide him in his investigations, or that Davis reported the specific investigations he had made, further than, he had gone into the county where the lands were situated.

It appears by the testimony of Mr. Hughes that the appellee inquired of him in regard to Anspach's title to the Deborah Grant tract only. That nothing was said to him which led him to suppose the William Kichner tracts were the subject of inquiry. Had his attention been called to these tracts, he should have answered that Anspach had an unquestioned legal title. The auditors therefore say, "the assignee in fine seems to have suffered himself to be dissuaded from following up the lands by the loose declarations of irresponsible parties accidentally met, the hasty assertions of a lawyer given upon incorrect data furnished by the assignee himself, and the crude, ill-considered opinions of unqualified laymen."

In the "summary of facts," which the auditors further report to have found, a majority of them declare that the assignee "made a feeble, insufficient attempt to reduce into possession the lands

in Schuylkill county, which had, under his deed of assignment, been vested in him; that these lands were of the value of $70,000 and upwards, and were sufficiently valuable to have paid, if sold, the whole indebtedness of Anspach then due the plaintiff."

The appellee further justifies his action in regard to the land, from the fact that some of the active stockholders of the plaintiff went upon the ground with him, and they also came to the same conclusion he did, in regard to Anspach's title. A majority of the auditors found that this fact showed concurrent negligence on the part of the plaintiffs, and therefore refused to surcharge the appellee with any proceeds of the lands. The court confirmed the report.

Both court and auditors appear to have overlooked the fact, that none of the stockholders in any manner participated in the consultation which the appellee had with his counsel. There is no evidence that any of the stockholders had any information as to Anspach's defective title, or that the appellee supposed they had any information, other than that which was acquired when they were on the premises together. This was manifestly so insufficient and unreliable that the appellee was not justified in predicating his final action either the facts there communicated, nor the opinion of any person known to have been formed on those facts. The appellee concedes the inadequacy of all the information there obtained, to lead to an intelligent opinion, by his endeavor to show that he afterwards consulted with a lawyer in regard to Anspach's title. He did not then rely on any opinion those stockholders formed or expressed. A lawyer himself, he knew the necessity of getting the opinion of a lawyer familiar with land-titles. He well knew the value of a lawyer's opinion depends on the fulness and entire accuracy with which the facts are communicated to him. The means of ascertaining the name of the tract on which the mines were located, were easily within his reach. His duty clearly required him to ascertain that fact and to communicate it to the lawyer whose opinion he asked. We cannot see how any person, in the exercise of common prudence and care, would have done less. His failure so to do, united with his notice to Reed that the debt against Anspach was paid, thus causing him to reconvey, were such a dereliction of duty as clearly to constitute supine negligence and make him liable for the loss which the appellants thereby sustained. The learned judge, therefore, erred in not surcharging the appellee with such portion of the value of these lands as will equal the residue of the indebtedness due from Anspach to the appellants.

We will not discuss *seriatim* the thirty-one assignments of error filed. The evidence shows the transactions to have been numerous and complicated. They extended over many years. The funds which the appellee used as assignee were mingled with those he

[Chambersburg Saving Fund Association's Appeal.]

held under other trusts.    This appears to have been done with the assent of the stockholders, and in some cases with their active co-operation.    We therefore feel unwilling to say there is any error in the conclusions to which the court have arrived, other than as to the action of the appellee in relation to the coal-lands.    The decree, therefore, should be so far modified as to surcharge the appellee with a sum equal to the residue of the debt due from Anspach to the appellants, and the residue of the decree be confirmed.

> And now, decree reversed; and it is ordered that the record be remitted, with instructions to enter a decree conformably to this opinion, and that the appellee pay the costs of this appeal.